In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-15-00085-CV
_____

REYTEC CONSTRUCTION RESOURCES, INC., Appellant

V.

BAPTIST HOSPITALS OF SOUTHEAST TEXAS, Appellee

On Appeal from the 60th District Court
Jefferson County, Texas
Trial Cause No. B-193,365

MEMORANDUM OPINION

Reytec Construction Resources, Inc. ("Reytec") appeals the trial court's amended final judgment granting summary judgment in favor of Baptist Hospitals of Southeast Texas (the "Hospital"). Reytec presents four issues on appeal. Because we conclude that Reytec raised a genuine issue of material fact precluding summary judgment on the Hospital's breach of contract claim, we reverse the trial court's judgment and remand this cause for further proceedings.

1

# I. Background

Reytec is in the underground utility and road-construction business. The City of Beaumont hired Reytec to perform a road-construction project, which entailed excavation, removal, and replacement of an old roadway and everything beneath the roadway, including the storm drainage system and waterlines. In connection with this project, Reytec entered into a Lease Agreement (the "Lease") with the Hospital, whereby Reytec leased property (the "Property") from the Hospital that was located near Reytec's construction site to serve as a location for it to store its construction equipment. The Lease provided that Reytec could use the Property "solely for the purpose of a construction equipment storage and material laydown yard." Relevant to the issues on appeal, Paragraph 12 of the Lease provides: "SURRENDER OF PREMISES. Upon the expiration of the term hereof, Tenant shall surrender the Premises in as good a state and condition as they were at the commencement of this Lease Agreement, reasonable use and wear and tear thereof and damages by the elements excepted." The Lease was executed by David Parmer, the CEO of the Hospital and by Greg Reyes, Reytec's owner and President.

In connection with the road-construction project, Reytec also required a place to deposit the materials it excavated, including concrete, dirt, and other

materials. During a preconstruction meeting with the Hospital, Reytec's project manager and general superintendent, Thomas Gill, asked the Hospital if it wanted the dirt from the excavation of the road. At first the Hospital declined Gill's offer, but later, Jessie Deville, the Administrative Director of Facilities for the Hospital, informed Gill that the Hospital did want the dirt to use in a future Hospital project. On March 22, 2010, Reytec and the Hospital entered into a "Dump Contract[.]"The relevant portion of the Dump Contract provides:

> I acknowledge by my signature below that I accept delivery, possession, and responsibility for excavated material as is delivered to [the Property] by [Reytec] for the sum of $00.00 per load for a total of $00.00. I further acknowledge that [Reytec] is only obligated to stock-pile material to allow for it to be mowed. Any surveying of property or land permits are the responsibility of the owner or representative of property where excavated material is to be delivered.

Deville signed the Dump Contract in his official capacity as the Hospital's Administrative Director of Facilities.

There is evidence in the record to support that the Hospital gave Reytec access to the Property to start delivering excavated materials shortly after the Hospital entered into the Dump Contract with Reytec. But, approximately ten months later, on January 20, 2011, Deville asked Gill to remove the excavated materials from the Property. At that time, Gill reminded Deville that under the Dump Contract the excavated materials were the Hospital's responsibility but gave

3

Deville an estimate on what Reytec would charge the Hospital to remove the materials.

The Lease term was scheduled to end February 28, 2011. The Hospital decided not to renew the Lease but agreed to a short lease extension to allow Reytec time to procure a new property. After securing a new property to serve as its laydown yard, Reytec began removing its construction equipment from the Property. On March 7, 2011, the Hospital's attorney sent Reytec a letter threatening to "take immediate steps to have [Reytec] evicted" unless Reytec removed its equipment and the excavated materials from the Property. Reytec eventually removed all of its equipment but did not remove the excavated materials. After Reytec left the Property, Deville obtained quotes from two other companies to have the excavated materials removed. The Hospital secured the services of AAA Floodmasters and paid $100,000 to remove the excavated materials from the Property.

On October 17, 2012, the Hospital filed suit against Reytec, asserting claims for breach of contract based on the Lease. The Hospital amended its petition and asserted additional claims for breach of the Lease and also asserted an alternative claim for breach of contract based on the Dump Contract. The Hospital sought to recover the cost of removing the excavated materials from the Property, restoring

4

the Property to its pre-Lease condition, and claimed damages for diminished market value of the Property and the "loss of potential sale(s) of the [Property.]" The Hospital further sought attorney's fees and its alleged costs associated with evicting Reytec from the Property.

Reytec filed a general denial of the Hospital's allegations and asserted various affirmative defenses. Relevant to the issues on appeal, Reytec alleged that (1) the Hospital waived its right to assert its claims regarding the excavated materials through execution of the Dump Contract, (2) the Hospital released Reytec from all obligations or responsibilities concerning the excavated materials, and (3) the Dump Contract served as a modification of the Lease thereby relieving Reytec of any obligations and duties under the Lease regarding the excavated materials.

On November 14, 2014, the Hospital filed a second amended traditional and no-evidence motion for summary judgment. Therein, the Hospital sought summary judgment on its claims for breach of the Lease, breach of the Dump Contract, and Reytec's affirmative defenses. On December 15, 2014, the trial court granted the Hospital's motions for summary judgment in their entirety, and awarded the Hospital $100,000 in actual damages. The trial court also generally awarded the Hospital reasonable and necessary costs and attorney's fees and pre-and post-

5

judgment interest. On February 19, 2015, the trial court amended its final judgment to include an award of $94,582.85 in attorney's fees, $3,590.64 in taxable costs, and $10,833.33 in pre-judgment interest. The trial court also awarded the Hospital conditional appellate attorney's fees, costs, and interest. Reytec appealed the trial court's judgment.

## II. Standard of Review

We review a trial court's grant of a motion for summary judgment *de novo*. *Buck v. Palmer*, 381 S.W.3d 525, 527 (Tex. 2012); *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). A no-evidence motion for summary judgment under Rule 166a(i) must challenge at least one specific element of the opponent's claim or defense on which the opponent will have the burden of proof at trial. Tex. R. Civ. P. 166a(i). The opponent must then present summary judgment evidence raising a genuine issue of material fact to support the challenged elements. *Id*. "The court must grant the motion unless the respondent produces summary judgment evidence raising a genuine issue of material fact" on the challenged elements. *Id*. A genuine issue of material fact is raised when the nonmovant produces more than a scintilla of evidence establishing the existence of the challenged element. *Fort Worth Osteopathic Hosp., Inc. v. Reese*, 148 S.W.3d 94, 99 (Tex. 2004).

6

To prevail on a traditional motion for summary judgment, a movant must prove that there is no genuine issue regarding any material fact and that it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Little v. Tex. Dep't of Criminal Justice*, 148 S.W.3d 374, 381 (Tex. 2004). A matter is conclusively established if reasonable people could not differ as to the conclusion to be drawn from the evidence. *See City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005). When a party moves for summary judgment on a claim for which it bears the burden of proof, the party must show it is entitled to prevail on each element of its cause of action. *See Parker v. Dodge*, 98 S.W.3d 297, 299 (Tex. App.—Houston [1st Dist.] 2003, no pet.). The party meets this burden if it produces evidence that would be sufficient to support an instructed verdict at trial. *Id.*

If the movant satisfies this burden, then the burden shifts to the nonmovant to raise a genuine issue of material fact precluding summary judgment. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995). To defeat a motion for summary judgment by raising an affirmative defense, the nonmovant must do more than just plead the affirmative defense. *Lunsford Consulting Grp., Inc. v. Crescent Real Estate Funding VIII, L.P.*, 77 S.W.3d 473, 475 (Tex. App.—Houston [1st Dist.] 2002, no pet.). The nonmovant must come forward with evidence sufficient to raise a fact issue on each element of its affirmative defense. *Brownlee v.*

7

*Brownlee*, 665 S.W.2d 111, 112 (Tex. 1984); *Anglo-Dutch Petrol. Int'l, Inc. v. Haskell*, 193 S.W.3d 87, 95 (Tex. App.—Houston [1st Dist.] 2006, pet. denied).

In reviewing both a traditional and no-evidence summary judgment, we consider the evidence in the light most favorable to the nonmovant. *See Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009); *Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009). We credit evidence favorable to the nonmovant if a reasonable fact finder could, and we disregard contrary evidence unless a reasonable fact finder could not. *See Mann Frankfort*, 289 S.W.3d at 848.

Generally, when the trial court does not specify the grounds for its ruling, as is the case here, we will affirm the summary judgment if any of the theories advanced by the motion are meritorious. *See State v. Ninety Thousand Two Hundred Thirty-Five Dollars & No Cents in U.S. Currency*, 390 S.W.3d 289, 292 (Tex. 2013); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003). The Hospital advanced numerous grounds in its motions for summary judgment; however, the Hospital abandoned all but one of those grounds on appeal. In its brief, the Hospital argues: "[S]ummary judgment was proper, strictly based upon its claim of Reytec's breach of section 12 of the Lease. In this appeal[,]

8

the Hospital does not claim that the summary judgment was based upon any other ground set forth in its Motions." The Hospital further argues:

> Reytec devotes about one-half of its Brief to its defense of the Hospital's claims in its motions for summary judgment for: (1) breaches of the Lease Agreement other than Reytec's failure to return the premises to their pre-lease condition . . . and (2) breaches of the Dump [C]ontract . . . . The Hospital will not respond to those points because of its contention that the summary judgment was absolutely correct in sustaining the Hospital's claim of breach of the Lease by reason of Reytec's failure to return the premises to its pre-lease condition.

Because the Hospital has abandoned these grounds on appeal, we do not address them or Reytec's responses thereto in this appeal. *See State Farm Fire & Cas. Co. v. S.S.*, 858 S.W.2d 374, 384 n.2 (Tex. 1993) (Gonzalez, J., dissenting) (stating that "if a [ground] was abandoned or otherwise withdrawn, it would be improper for the appellate court to render judgment upon it"); *Wojcik v. Wesolick*, 97 S.W.3d 335, 336–37 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (holding that the court of appeals would not address summary judgment ground abandoned on appeal); *Martin v. Martin, Martin & Richards, Inc.*, 991 S.W.2d 1, 4 n.1 (Tex. App.—Fort Worth 1997) (noting that appellees abandoned summary judgment ground of collateral estoppel by stating in their appellate brief that "they do not rely upon that doctrine"), *rev'd on other grounds*, 989 S.W.2d 357 (Tex. 1998).

### III. Breach of Contract

To prevail on a breach of contract claim, a plaintiff must prove (1) the existence of a valid contract; (2) the plaintiff's performance or tender of performance; (3) the defendant's breach; and (4) the plaintiff's damages resulting from the breach. *See Bank of Tex. v. VR Elec., Inc.*, 276 S.W.3d 671, 677 (Tex. App.—Houston [1st Dist.] 2008, pet. denied); *Sullivan v. Smith*, 110 S.W.3d 545, 546 (Tex. App.—Beaumont 2003, no pet.). "A breach of contract occurs when a party fails to perform an act that it has expressly or impliedly promised to perform." *Case Corp. v. Hi-Class Bus. Sys. of Am., Inc.*, 184 S.W.3d 760, 769–70 (Tex. App.—Dallas 2005, pet. denied).

The Hospital contends that it conclusively established its claim that Reytec breached Paragraph 12 of the Lease when Reytec "admitted failure to 'surrender the Premises in as good a state and condition as they were at the commencement of this Lease Agreement, reasonable wear and tear thereof and damages by the elements except." Reytec does not dispute that it left the excavated materials on the Property at the end of the Lease. Rather, Reytec contends that it was no longer obligated under the Lease or was otherwise excused from removing the excavated materials because the parties had entered into the Dump Contract, which altered

Reytec's obligations under the Lease. Thus, the real point of contention between the parties is how, if at all, the Dump Contract affects the terms of the Lease.

According to the Hospital, the Dump Contract did not modify the Lease, but rather the Dump Contract was abrogated by Paragraph 24 of the Lease. Paragraph 24 provides that the Lease "contains the entire agreement between the parties" and that it can only be modified "through a written amendment signed by all of the parties hereto." The Hospital contends that the Dump Contract could not have modified the Lease because it was entered into before the Lease was formally executed by the parties. The Hospital argues that instead, the Dump Contract "merged into the [Lease] and was of no further force and effect when the [Lease] was signed."

According to Reytec, the Dump Contract relieved Reytec of the obligation to remove the excavated materials from the Property by modifying the terms of the Lease, and that by entering into the Dump Contract, the Hospital waived its right to complain about the excavated materials and released Reytec of any obligations regarding the materials left on the Property. Reytec argues that the trial court erred in granting summary judgment because there remain material fact issues regarding its affirmative defenses of modification, release, and waiver. Reytec contends that the Dump Contract modified the Lease by expressly allowing Reytec to stockpile

11

excavated materials on the Property during the Lease term and in relieving Reytec of any obligation to remove the materials at the end of the Lease. To properly analyze this dispute, we must first examine the terms of the Lease and the Dump Contract. Then, we must consider all of the summary judgment evidence in a light most favorable to the nonmovant Reytec to determine whether there is a genuine issue of material fact regarding the parties' intent to modify or otherwise alter their respective obligations under the Lease.

## A. Contract Interpretation

Our primary concern in construing a lease contract is to ascertain the true intent of the parties. *See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). In so doing, "'we must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless.'" *Id*. (quoting *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003)). To understand the parties' intent, we must examine the agreement as a whole in light of the circumstances present at the time when the parties entered into the agreement. *Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 449–51 (Tex. 2011). "Facts and circumstances that may be considered include the commercial or other setting in which the contract was negotiated and other

objectively determinable factors that give context to the parties' transaction." *Americo Life, Inc. v. Myer*, 440 S.W.3d 18, 22 (Tex. 2014). The parol-evidence rule does not prohibit considering surrounding "facts and circumstances that inform the contract text and render it capable of only one meaning." *Id*. No single provision taken alone should control—instead, we must consider all provisions with reference to the entire agreement. *J.M. Davidson*, 128 S.W.3d at 229. We also consider the particular business activity to be served, and when possible and proper, we avoid a construction that is unreasonable, inequitable, and oppressive. *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (quoting *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)). We begin our analysis with the Lease's express language. *See Italian Cowboy*, 341 S.W.3d at 333.

The opening statement of the Lease provides, "THIS LEASE AGREEMENT . . . made and entered into this _____ day of _____, 2010, by and between . . . ." The parties never filled in the blanks to reflect the date in which the Lease was "entered into[.]" The plain language of the Lease reflects that it is for a term of one year—to begin February 28, 2010 and terminate February 28, 2011. The Lease specifies that it "shall commence on February 28, 2010" and then defines the term "Commencement

13

Date" as used in the Lease to mean "February 28, 2010." The Lease provides that rather than making rent payments to the Hospital, Reytec would "furnish all labor, materials, supplies, tools, equipment, supervision, utilities and all else necessary" to construct a sidewalk for the Hospital. According to the terms of the Lease, Reytec would complete this work by May 3, 2010. The Lease was executed by both parties; however, the execution paragraphs of the Lease are not dated.

Our review of the Lease reflects that it does not provide that the commencement date is determined or otherwise affected by the date the Lease was actually executed by the parties. The Lease uses the commencement date as the relevant date for the parties' obligation in Paragraph 12, which specifies that Reytec is to return "the Premises in as good a state and condition as they were at the commencement of this Lease[.]"

The summary judgment record includes the deposition transcripts of Thomas Gill and Thomas "Rusty" Pena. As explained above, Gill was Reytec's project manager and general superintendent for the road-construction project. Pena is Reytec's Vice President. Neither Pena nor Gill could testify as to when the Lease was formally executed by the parties. In response to requests for admission, Reytec responded that it could not admit or deny the date the lease was signed because it did not have sufficient information or knowledge to do so truthfully.

14

There is evidence in the record that the Lease was not formally executed by the Hospital until May 4, 2010. Jessie Deville, whose deposition transcript is also included in the summary judgment record, testified that the Hospital's CEO, Parmer, is in charge of executing contracts on behalf of the Hospital. It is undisputed that Parmer executed the Lease on behalf of the Hospital. The Lease was initialed by Bryan Chandler, another employee with the Hospital that helped negotiate the Lease. Deville testified that he did not know the specific date that the Lease was signed by Parmer or Chandler. However, Deville explained that the Hospital has a formal contract procedure in place, which culminates with the CEO's signature. He testified that a contract is required to have approval from a senior manager, the CFO, and the CEO. The Hospital produced its "Contract Approval Form" for the lease agreement between the Hospital and Reytec. The form is blank where it requests the "Initial Review Date[.]" The form states that the "Effective Date" is "2-28-10" and is for a term of twelve months to end "2-28-11[.]" The form has a place for various people in management to sign and date acknowledging their review and approval of the contract at issue. The form was signed by the Senior Manager of Department Review on April 9, 2010, and by the CEO on May 4, 2010. The form was also signed by the CFO, but there is no date for his signature. The Hospital also produced a form from its Risk Management

15

Department wherein the Vice President of Business Development signed on April 9, 2010 indicating he had reviewed the Lease. The Hospital's general counsel also signed a form on April 15, 2010, indicating he had reviewed the Lease. The form signed by the Hospital's general counsel reflects that the effective date of the lease is "2-28-10[.]" Therefore, even though there is some evidence that suggests the Lease was not formally executed by the Hospital until May 4, 2010, the Hospital's own internal documents at the time reflect that the Hospital intended the Lease to take effect February 28, 2010, as evidenced in the language of the Lease.

While the Hospital produced some evidence that the Lease was formally executed after its express commencement date, Deville testified that it was "feasible and doable" for the Hospital to have started performance under a contract before the contract approval procedures were complete. In fact, he testified that this was a practice that the Hospital engaged in. He explained, "We work out an agreement and the paperwork follows." Deville admitted that Reytec occupied the Property around February 28, 2010, before the Hospital formally executed the Lease. Additionally, there is evidence that Reytec had begun constructing the sidewalk contemplated under the Lease during the months of March, April, and May of 2010. Under the terms of the Lease, Reytec was required to complete the sidewalk by May 3, 2010. In Pena's affidavit, also included in the record, he stated

16

that it was always the intention of the parties that the Lease would start on February 28, 2010 and terminate one year later. He stated that the Hospital never informed Reytec that it intended the Lease to become effective on any other day.

We note that while the Hospital seeks an interpretation of the Lease that would have us ignore the express commencement date in the Lease's language, the Hospital has consistently sought to enforce the express termination date of the Lease, which was February 28, 2011. The Hospital also sought to hold Reytec to the May 3, 2010 deadline for completion of the sidewalk, which under the Hospital's interpretation of the Lease's effective date, would have required Reytec to complete the sidewalk before the Lease had commenced.

The plain language of the Lease is consistent with an interpretation that the parties' mutual intention regarding the Lease was that the effective start date was to be February 28, 2010, rather than the date the Lease was formally executed by the parties. The Hospital's merger argument is based on its contention that the Dump Contract was entered into before the Lease. In viewing the evidence in the light most favorable to the nonmovant Reytec, we conclude that Reytec has raised a genuine issue of material fact concerning the parties' intention to be bound by the Lease on its defined commencement date even though they anticipated the Lease would be formally executed in the future. *See Murphy v. Seabarge, Ltd.*, 868

S.W.2d 929, 933 (Tex. App.—Houston [14th Dist.] 1994, writ denied) ("Actions may manifest an intent to be bound to an agreement, even though the parties may expressly provide a formal contract will be executed in the future."); *see also Foreca, S.A. v. GRD Dev. Co.*, 758 S.W.2d 744, 745 (Tex. 1988) (quoting A. Corbin, *Corbin on Contracts* § 30 at 97 (1963)) (explaining that the question of the parties' intent to be bound with or without the execution of a final written contract is a question of fact for the jury). For all these reasons, we conclude the Hospital did not conclusively establish that the Dump Contract was entered into before the Lease, and therefore, has not shown as a matter of law that the Dump Contract was abrogated by the Lease under its merger provision. *See Pitman v. Lightfoot*, 937 S.W.2d 496, 529 (Tex. App.—San Antonio 1996, writ denied) (explaining that the merger doctrine "refers to the extinguishment of one contract by its absorption into another subsequent contract and is largely a matter of [the] intention of the parties").

## B. Contract Modification

Reytec contends that it is not liable for breach of contract because the Dump Contract modified its obligations under the Lease. Contract modification is an affirmative defense that Reytec had the burden to prove. *See Intec Sys., Inc. v. Lowrey*, 230 S.W.3d 913, 918 (Tex. App.—Dallas 2007, no pet.). The

18

determination of whether a contract has been modified depends on the parties' intentions and is a question of fact. *Arthur J. Gallagher & Co. v. Dieterich*, 270 S.W.3d 695, 702 (Tex. App.—Dallas 2008, no pet.). A valid contract modification must include a meeting of the minds supported by consideration. *Id*.; *see Dupree v. Boniuk Interests, Ltd.*, 472 S.W.3d 355, 367–68 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (explaining that a modification to a lease agreement must be supported by consideration independent of the consideration provided in the original lease). "In determining whether the parties had a meeting of the minds concerning a modification of a contract, the focus is on what the parties did and said, not their subjective states of mind." *Dieterich*, 270 S.W.3d at 702. Consideration may consist of a benefit that accrues to one party or a detriment that is incurred by the other party. *Dupree*, 472 S.W.3d at 368. However, a promise to fulfill an obligation in which the party was already bound cannot serve as new consideration for the modification. *Id*.

The Dump Contract is essentially a letter agreement written on Reytec letterhead and is dated, March 22, 2010. In the Dump Contract, the Hospital agreed to "accept delivery, possession, and responsibility for excavated material as is delivered to [the Property] by [Reytec] for the sum of $00.00 per load for a total of $00.00." The Hospital further agreed Reytec was "only obligated to stock-pile

19

material to allow for it to be mowed." Deville signed the Dump Contract on behalf of the Hospital. Deville testified that he signed the Dump Contract and has no reason to believe that he did not sign it on March 22, 2010. Guy Giesecke, the former chief operating officer for the Hospital, initialed the Dump Contract.

The plain language of the Dump Contract supports that the parties had a meeting of the minds that Reytec, at the very least, was permitted to stockpile excavated materials on the Property. The plain language also supports that the parties had a meeting of the minds that the Hospital would not only take delivery and possession of the excavated materials, but that the Hospital would also become responsible for the materials delivered to the Property by Reytec.

Contrary to the Hospital's contention, there is nothing in the plain language of the Dump Contract itself to suggest that the Hospital was only agreeing to temporarily take possession of and responsibility for the materials. Moreover, there is evidence in the record that conflicts with this contention. Deville testified that when he executed the Dump Contract, he was considering the Hospital's ability to use the excavated dirt "to fill a hole that would be created from destruction of another building." He testified that early during the term of the Lease, he realized that the Hospital could not use the dirt as he had anticipated, so he informed Reytec that the Hospital no longer wanted to accept delivery, possession, and

20

responsibility for the excavated materials. It is undisputed that, at least at some point during the Lease term, the Hospital intended to use the excavated materials for its own benefit. This evidence is inconsistent with the Hospital's argument that Reytec owned the dirt and was only allowed to store it on the Property temporarily.

Reytec also argues that the Lease modification was supported by new consideration. Reytec agreed to deliver and stockpile the excavated materials on the Property free of charge to the Hospital. And, in return, the Hospital gave up its right to enforce Paragraphs 10 and 12 of the Lease. The Hospital does not challenge Reytec's contention that the modification was supported by new consideration.

We conclude that Reytec has presented more than a scintilla of evidence that a fact issue remains as to whether the parties' intended to modify the Lease with the Dump Contract. Further, we conclude that Reytec produced summary judgment evidence sufficient to raise a fact issue on each element of its defense of modification.

## C. Waiver

Reytec also alleged that through the Dump Contract, the Hospital waived its right to assert its claims regarding the excavated materials. The Hospital's only argument on appeal regarding Reytec's waiver defense is that the Dump Contract

21

was abrogated by the Lease's merger clause. However, as discussed above, Reytec has raised a genuine issue of material fact regarding the merger argument.

Waiver is the intentional relinquishment of a known right and is either made expressly or indicated by conduct that is inconsistent with an intent to claim the right. *See Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003). "The elements of waiver include (1) an existing right, benefit, or advantage held by a party; (2) the party's actual knowledge of its existence; and (3) the party's actual intent to relinquish the right, or intentional conduct inconsistent with the right." *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008). "Waiver is largely a matter of intent, and for implied waiver to be found through a party's actions, intent must be clearly demonstrated by the surrounding facts and circumstances." *Jernigan*, 111 S.W.3d at 156. Ordinarily, waiver is a question of fact, but if the surrounding circumstances and facts are undisputed, the question becomes one of law. *Id.* at 156–57.

The Hospital does not dispute the first two elements of Reytec's waiver defense. The summary judgment record supports that the Hospital held rights under the Lease and that it had knowledge of those rights. As explained above, Reytec has presented more than a scintilla of evidence to support that the Dump Contract was not abrogated by the Lease, but rather was intended by the parties to

22

alter their various obligations under the Lease. There is evidence in the record that the Hospital allowed Reytec to continue to stockpile excavated materials on the Property several months after the time the Hospital claims that the Dump Contract was abrogated. There is also evidence in the record that even though the Hospital had a representative observe the Property on a weekly basis, the Hospital did not complain about the continued stockpiling of excavated materials until months after the Dump Contract was allegedly abrogated. In viewing the evidence in the light most favorable to Reytec, we conclude that Reytec has raised a genuine issue of material fact concerning each element of its affirmative defense of waiver sufficient to preclude summary judgment.

**D. Release**

Reytec also alleged that through the Dump Contract, the Hospital released Reytec from all obligations or responsibilities concerning the excavated materials. "A release is an agreement or contract in which one party agrees that a legal right or obligation owed by the other party is surrendered." *D.R. Horton–Tex., Ltd. v. Savannah Props. Assocs., L.P.*, 416 S.W.3d 217, 226 (Tex. App.—Fort Worth 2013, no pet.). Because a release is essentially a contract, a defendant must prove the elements of a contract to establish the affirmative defense of release of liability. *Vera v. North Star Dodge Sales, Inc.*, 989 S.W.2d 13, 17 (Tex. App.—San Antonio

23

1998, no pet.). We construe a release primarily "to ascertain and give effect to the intention of the parties to the release, considering the instrument as a whole." *D.R. Horton*, 416 S.W.3d at 226. Here, again, the Hospital's only challenge to this defense is to the continued enforceability of the Dump Contract. As we have explained above, Reytec has presented evidence to raise a genuine issue of material fact as to the parties' intentions regarding the Lease and the Dump Contract. For the same reasons as identified above, viewing the evidence most favorably to the nonmovant Reytec, we conclude that Reytec has presented sufficient summary judgment evidence to raise a genuine issue of material fact concerning each element of its release defense to preclude summary judgment.

The only summary judgment ground asserted by the Hospital on appeal is that Reytec is liable for breach of contract for not fulfilling its obligations under Paragraph 12 of the Lease. We have concluded that Reytec has raised genuine issues of material fact regarding its affirmative defenses of modification, waiver, and release sufficient to preclude summary judgment on the breach of contract issue. Because the Hospital has abandoned its other summary judgment grounds, we need not address those issues. Therefore, the trial court erred in granting summary judgment, and we reverse the trial court's judgment and remand this cause for further proceedings.

REVERSED AND REMANDED.

_____
CHARLES KREGER
Justice

Submitted on November 30, 2015
Opinion Delivered November 23, 2016

Before McKeithen, C.J., Kreger and Johnson, JJ.